CONTINENTAL CABLEVISION OF MICHIGAN, INC v
CITY OF ROSEVILLE

Docket No. 80426. Argued December 9, 1987 (Calendar No. 7). Decided
June 27, 1988.

Continental Cablevision of Michigan, Inc., challenged assessments
of personal property taxes by the City of Roseville in 1982,
1983, and 1984 for "house drops," a portion of the company's
cable system which extends from its main cables into subscrib-
ers' homes, claiming that house drops are fixtures taxable to
each subscriber. The Tax Tribunal upheld the assessment. The
Court of Appeals, BEASLEY, P.J., and R. B. BURNS and LOS-
TRACCO, JJ., affirmed, concluding that the degree of annexation
to the realty, the nature of the adaption, and the intention of
the parties supported the Tax Tribunal's determination (Docket
No. 88698). The petitioner appeals.

In an opinion by Chief Justice RILEY, joined by Justices
BRICKLEY, CAVANAGH, BOYLE, ARCHER, and GRIFFIN, the Su-
preme Court *held:*

For purposes of ad valorem taxation, the cable company is
the owner of the house drops. Accordingly, the city properly
assessed personal property taxes on the house drops against the
company for the years 1982, 1983, and 1984.

1. All real and personal property located within Michigan
which is not expressly exempted is subject to taxation. Real
property under the General Property Tax Act includes fixtures.
In determining whether an item of property is a fixture, the
degree of its annexation to the realty, the nature of its adapta-
tion, and the intention of the parties are to be considered. The
focus of analysis is the intention to make the item a permanent
accession to the freehold as determined by examining the
objective, visible facts.

2. For purposes of taxation, ordinary utility lines and sup-
ports are to be assessed as the personal property of a public
utility. While a cable system has been held not to be a public

REFERENCES

Am Jur 2d, Telecommunications §§ 186 *et seq.*
Cable television equipment or services as subject to sales or use
taxes. 5 ALR4th 754.

utility within the meaning of Const 1963, art 7, § 25, it is a public utility for purposes of the Subdivision Control Act. Thus, there is no justifiable reason for treating house drops differently than other utility drops for purposes of taxation.

3. In this case, although it is undisputed that the house drops were intended to be permanently attached to the homes, there were no express agreements that they would become the property of the subscribers upon installation. Upon examining all the surrounding circumstances including the subscription agreement between the cable company and its subscribers, its accounting and business practices, and the treatment afforded other utilities in the area of taxation, it is to be concluded that the finding of the Tax Tribunal that the house drops are personalty belonging to the petitioner is supported by competent, material, and substantial evidence and that the city's assessment of personal property taxes against the petitioner for the years at issue was proper.

Affirmed.

Justice LEVIN, dissenting, stated that there is no basis in the record for concluding that Continental acted inconsistently with its assertion that it intended that the house drops become permanent accessions to the realty. The only evidence that might support the finding of the Tax Tribunal is the failure of the subscription agreement to provide unequivocally that title, ownership, and control of the house drops are vested in the owners of the realty. Other substantial evidence, however, tends to support Continental's claim that it did relinquish title, ownership, and control of the house drops.

158 Mich App 60; 404 NW2d 704 (1987) affirmed.

1. TAXATION — PERSONAL PROPERTY — CABLE TELEVISION SYSTEMS — HOUSE DROPS.

Extensions from a cable television company's main cable to subscribers' homes were held to be personal property of the company, rather than fixtures of the subscribers' real property, for purposes of ad valorem taxation where the agreement between the company and its subscribers and the company's business and accounting practices indicated an intent to treat the extensions as the personal property of the company and such treatment comported with that afforded other utilities in the area of taxation (MCL 211.1 *et seq.;* MSA 7.1 *et seq.*).

2. TAXATION — FIXTURES — REAL PROPERTY.

The factors for determining whether an item is a fixture, taxable as real property, are the degree of annexation to the realty, the

nature of its adaptation, and the intention of the parties; the focus of analysis is the intention to make the item a permanent accession to the freehold as determined by examining the objective, visible facts (MCL 211.1 *et seq.;* MSA 7.1 *et seq.*).

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Gregory L. McClelland* and *Jeffery V. Stuckey*) for the petitioner.

*LaBarge, Dinning & Greve, P.C.* (by *Ronald H. Greve*), for the respondent.

Amici Curiae:

*William J. DeBiasi, P.C.* (by *William M. DeBiasi*), for Maclean Hunter Cable Television.

*Hertzberg, Jacob & Weingarten, P.C.* (by *Abraham Singer* and *Joel D. Applebaum*), for Metrovision of Oakland County, Livonia and Redford.

*Stephen R. Smith* for Michigan Cable Television Association.

*O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C.* (by *Neil J. Lehto*), for Michigan Municipal League.

RILEY, C.J. This case of first impression involves the assessment of personal property taxes by the City of Roseville in 1982, 1983, and 1984. We granted leave to determine whether "house drops," a portion of the cable television system operating in the city, are owned by and assessable as the personal property of the cable company or, instead, are fixtures, taxable to each subscriber to whose home the cable runs.

We hold that the cable company owns the house

drops for ad valorem tax purposes.[1] Accordingly, we hold that the city properly assessed to the cable company a personal property tax on the house drops for the three years in question. We affirm the Court of Appeals decision upholding the judgment of the Michigan Tax Tribunal.

## I. FACTS AND PROCEEDINGS

Petitioner-appellant, Continental Cablevision of Michigan, owns and operates a cable television system in the City of Roseville, the respondent-appellee in this matter. Essentially, the system operates through cables which transmit television signals into the residences of subscribers. Three primary components comprise petitioner's system: (1) the main cables, which run underground or aerially along utility poles, (2) the house drops, which extend from the main cables into the subscribers' homes and end in wall plates resembling telephone jacks,[2] and (3) the converters, which affix to the outlets, linking the television sets to the cable system. At issue in the instant case is the status of the house drops for tax purposes.

[1] Black's Law Dictionary (4th ed), p 58, defines "ad valorem" to mean "[a]ccording to value." "The term *ad valorem* tax means a tax or duty upon the value of the article or thing subject to taxation." *Id.,* citing *Arthur v Johnston,* 185 SC 324, 330; 194 SE 151 (1937).

[2] If the main cable runs underground, then the house drop begins at a CATV "pedestal" and continues to run underground (at least eighteen inches below the surface) to a "ground block" which is attached to the residence. If the primary cable runs aerially, then the house drop starts at a public utility pole and extends across the subscriber's property to the residence. Michigan Tax Tribunal opinion, p 3.

The house drop then traverses the side of the house and is physically affixed to the residence by clamps, hooks, bolts, or similar connecting devices. A small hole is drilled into the side of the home to permit the house drop to enter the residence. The house drop then runs internally to the room in which the cable service is desired. Once it is in the proper location, the house drop is installed in a wall plate. *Id.*

Similarly, in multifamily structures, the house drops run internally through the walls and floors of the building to each individual unit. *Id.*

Petitioner contends that a house drop, upon installation on a subscriber's real property, becomes a fixture properly assessable to the owner of the realty. Alternatively, petitioner suggests that each house drop is owned by and taxable as the personalty of each subscriber. Respondent, on the other hand, argues that petitioner retains ownership of house drops after installation. Thus, in the instant case, the house drops were properly taxed as the personal property of petitioner.

Petitioner was assessed taxes on the house drops for 1982, 1983, and 1984.[3] After failing to obtain relief from respondent's tax board of review,[4] the

[3] Petitioner's personal property in this case was assigned tax identification number 500-27432-00. The following chart indicates for each tax year the assessment on the roll, the average level of assessment, and the parties' respective contentions as to the true cash value of petitioner's personal property:

| TAX YEAR | ASSESSED VALUE | LEVEL | PETITIONER'S TRUE CASH VALUE | RESPONDENT'S TRUE CASH VALUE |
|----------|---------------|-------|------------------------------|------------------------------|
| 1982 | $1,193,876 | 50% | $1,028,615 | $2,387,752 |
| 1983 | 1,143,906 | 50% | 970,442 | 2,287,812 |
| 1984 | 1,096,753 | 50% | 921,753 | 2,193,506 |

[Michigan Tax Tribunal opinion, p 1.]

The difference between the parties' contentions of true cash value is attributable to the value of the house drops. Petitioner contends that the house drops should not have been included in its personal property tax assessment.

The value of the house drops is not at issue. The sole question herein is whether the house drops should have been assessed against petitioner. According to the above figures, petitioner apparently contends that its property should have been assessed as follows:

$$1982: \quad \$1,028,615 \times 50\% = \$514,307.50$$
$$1983: \quad \$\ 970,442 \times 50\% = \$485,221.00$$
$$1984: \quad \$\ 921,753 \times 50\% = \$460,876.50$$

Thus, for the three years in question, the difference between petitioner's proposed assessments (i.e., those excluding the house drops) and the actual assessments on the rolls (i.e., those including the house drops) totals $1,974,130.

[4] On April 23, 1982, Continental Cablevision was advised that the city's board of review had found the personal property assessment to be fair and equitable.

cable company filed a petition with the Michigan Tax Tribunal on May 20, 1982.[5] Eventually, similar petitions for 1983 and 1984 were consolidated.[6]

On February 25, 1985, a hearing was held before Tax Tribunal hearing officer Claris Kaye Cwirko. On June 7, 1985, the hearing officer rendered a proposed opinion, affirming the personal property assessments on the house drops. Petitioner filed exceptions to this proposed decision.

However, in an order entered October 29, 1985, the Tax Tribunal adopted and incorporated by reference the findings of fact and conclusions of law in the hearing officer's proposed opinion.

The Court of Appeals affirmed the decision of the Tax Tribunal. 158 Mich App 60; 404 NW2d 704 (1987).

The analysis adopted by the hearing officer, the Tax Tribunal, and the Court of Appeals is essentially identical. Each agreed that three factors must be examined in determining whether an item is a fixture: the degree of annexation to the realty, the nature of adaptation, and the intention of the parties. Each agreed that the first two elements were satisfied[7] and that the dispositive issue in this

---

[5] Continental Cablevision, in its petition (MTT Docket No. 65738), sought to invalidate that portion of the city's assessment against petitioner for personal property attributable to house drops.

[6] Petitioner's motion to consolidate all three appeals (MTT Docket Nos. 65738, 80169, and 90066) was granted on July 31, 1984.

[7] House drops are undoubtedly "annexed" to the realty. They are physically affixed to the residence by clamps, hooks, or bolts. Furthermore, a hole is drilled into the side of the home to permit the house drop to enter. Removing a house drop is not a simple task and would result in minor damage to the residence.

House drops are also "adapted" to the use of the realty to which they are connected. The only function of the cable and clamps (i.e., house drops) is to carry television reception to the residence in question. The value of a residence with a house drop is enhanced and would be diminished if it were removed. The component parts of the house drop, if removed from a subscriber's residence, would not be reusable and would be of little or no value to the subscriber. A house

matter was the intention of the parties. The Court of Appeals succinctly set forth its analysis as follows:

> The Tax Tribunal found that the first two criteria were met by the house drops. That finding is not in dispute on appeal. Rather, the controlling issue is the third factor. The tribunal found that petitioner did not intend that the house drops become fixtures. We believe the record supports this conclusion.
>
> When house drops are installed, the customer is charged $14.95. However, it costs petitioner approximately $40 in labor and materials to make the installation. By comparison, the charge to reconnect service to a residence with an existing house drop is $10. When service is disconnected, the house drops are not removed unless the customer so requests. Rather, service is turned off at the main cable line and the customer must turn in his converter.
>
> Also in the financial area is petitioner's treatment of the house drops costs for accounting purposes. The labor and material costs are capitalized and depreciated over a period of time. Petitioner treats the house drops as capitalized costs for federal and state tax returns. An accounting expert opined that petitioner's accounting methodology is inconsistent with the claim that petitioner does not own the house drops.
>
> Next, the service agreement that petitioner enters into with its customers provides for continuing control of the entire system to be exercised by petitioner. Paragraph 2 of the agreement grants

---

drop, after annexation, is not portable. Each is cut to a particular length suitable to the individual residence. While it is possible to remove the house drops, they are, in fact, rarely removed. In fact, in the instant case, Mr. Jack Ramseyer, Director of Engineering for Continental, testified that to his knowledge a house drop had never been removed by petitioner in the City of Roseville. Further, Mr. Ramseyer testified that petitioner had no policy for removal of the house drops upon cessation of service and that he had never heard of any subscriber requesting removal of the house drop.

petitioner the right to install, maintain, repair and replace "any and all components of the system." Paragraph 5 grants [the] exclusive right to repair and modify the system to petitioner. That paragraph also provides that the customer may not disturb, tamper with or reroute "any component of the system."

However, it should be noted that, while the agreement explicitly provides in a number of places for petitioner's right to remove the converter upon termination of service, there is no explicit provision governing removal of the house drops. As noted above, house drops are not routinely removed. However, this does not compel the conclusion that the house drops are fixtures. Rather, the economics may be such that it is advisable to leave the house drops in. The house drops do not appear to have any known salvage value. Thus, it would be uneconomical to remove them. Second, since a future resident may desire service, or the same customer may wish to reconnect in the future, and the installation cost is greater than the installation charge, it could be more economical to leave the house drops in.

In view of petitioner's accounting treatment of the house drops and that customers have no right of control over the house drops, we conclude that there is competent, material and substantial evidence to support the tribunal's conclusion that the house drops are personalty belonging to petitioner rather than fixtures or personalty belonging to the customers. [158 Mich App 64-65.]

On March 9, 1987, petitioner filed an application for leave to appeal in this Court. We granted leave on June 30, 1987. 428 Mich 911 (1987).

### II. DISCUSSION

The General Property Tax Act of Michigan[8] mandates that all real and personal property lo-

---

[8] MCL 211.1 *et seq.;* MSA 7.1 *et seq.*

cated within the state, not expressly exempted, is subject to taxation. MCL 211.1; MSA 7.1. Real property is defined as "all lands within the state, and all buildings and *fixtures* thereon . . . ."[9] Personal property, for purposes of taxation, means "[a]ll goods, chattels, and effects within the state."[10] According to the act, if the house drops in the case at bar are fixtures, then they are taxable to the owner or occupant of the realty.[11] On the other hand, if the house drops are personalty, then they are assessable against the owner of the house drops.[12]

Our scope of review in this matter is narrow. In the absence of fraud, appellate review of decisions of the Tax Tribunal is limited to determining whether the tribunal made an error of law or adopted a wrong principle; the factual findings of the tribunal are final, provided they are supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Fisher-New Center Co v State Tax Comm (On Rehearing)*, 381 Mich 713; 167 NW2d 263 (1969).

Courts of this state have consistently applied a three-factor test to determine whether an item of property constitutes a fixture. The factors are: " '[1] *annexation* to the realty, either actual or

[9] MCL 211.2; MSA 7.2 (emphasis added).

[10] MCL 211.8(a); MSA 7.8(a).

[11] MCL 211.3; MSA 7.3 provides:

Real property shall be assessed in the township or place where situated, to the *owner* if known, and also to the occupant, if any; if the owner be not known and there be an occupant, then to such occupant, and either or both shall be liable for the taxes on said property . . . . [Emphasis added.]

[12] MCL 211.13; MSA 7.13 provides: "All tangible personal property . . . shall be assessed to the *owner* thereof, if known, in the township in which it is located on the tax day." (Emphasis added.) But see MCL 211.9(f); MSA 7.9(f) which exempts from taxation certain items of household personalty.

constructive; [2] *adaptation* or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and [3] *intention* to make the article a permanent accession to the freehold.'" *Peninsular Stove Co v Young,* 247 Mich 580, 582; 226 NW 225 (1929); *Morris v Alexander,* 208 Mich 387; 175 NW 264 (1919) (emphasis added).

The focus of our analysis is the intention to make the house drop a "permanent accession" to the freehold. Generally, this determination is made by examining the objective, visible facts. *Michigan Nat'l Bank v City of Lansing,* 96 Mich App 551, 554; 293 NW2d 626 (1980), affirmed by an equally divided Court 414 Mich 851; 322 NW2d 173 (1982). See also *San Diego Trust & Savings Bank v San Diego Co,* 16 Cal 2d 142; 105 P2d 94 (1940). It is undisputed herein, after viewing the objective visible facts, that petitioner intended that the house drops be permanently attached to the homes they serve. See above, n 7. However, this Court has long embraced the principle that

> [t]he permanency of the attachment, and its character in law, do not depend so much upon the degree of physical force with which the thing is attached, or the manner and means of its attachment, as upon the motives and intention of the party in attaching it. If the intention is that the articles attached shall not by annexation become a part of the freehold, as a general rule they will not. [*Manwaring v Jenison,* 61 Mich 117, 134-135; 27 NW 899 (1886). See also *Woodliff v Citizens Building & Realty Co,* 240 Mich 413, 416; 214 NW 343 (1927).]

Although the physical facts demonstrate that Continental intended that the house drops remain in the subscribers' homes permanently, we must

examine the other objective evidence offered in this case in order to determine whether petitioner intended that the house drops become "accessions" to the realty. Black's Law Dictionary (5th ed), p 13, defines "accession" as "[c]oming into possession of a right or office; increase; augmentation; addition." In our view, this definition implies a transfer of ownership and control over the property attached.[13]

In the instant case, there was no express agreement that the house drops would, upon installation, become the property of the subscribers. Thus, our essential inquiry is to determine, from the objective evidence, whether the annexing party, i.e., Continental, intended to relinquish ownership and control over the house drops. *Kent Storage Co v Grand Rapids Lumber Co,* 239 Mich 161, 165; 214 NW 111 (1927).

> The intention considered is not a secret or undisclosed intent, but the apparent intent, *that inferred from all the facts and circumstances,* such as the relation and situation of the annexor, the policy of the law, the manner of annexation, and the purpose or use for which the annexation was

---

[13] This notion of intent to transfer ownership has long been considered the pivotal question in fixture analysis. In *Lansing Iron & Engine Works v Wilbur,* 111 Mich 413; 69 NW 667 (1897), this Court had to decide whether a boiler installed in a building should be treated as personalty or whether it became so affixed to the realty that it passed under the deed to the purchaser of the building. In holding that the boiler remained the personal property of the annexor, we adopted the rationale that

"[t]here was nothing done by [the annexor] indicative of an intent to permit the machinery to be so annexed to the realty as to change its character. The state of the title to the realty, and the conduct of [the annexor] regarding the machinery, negatived any intent on his part to allow his interest in the machinery to be absorbed by the owners of the realty, or to permit it to be merged." [111 Mich 419.]

made. [36A CJS, Fixtures, § 2b, p 596. Emphasis added.]

The Court of Appeals held that the record supported the Tax Tribunal's determination that petitioner did not intend to relinquish ownership of the house drops. The Court reached this result by examining the service agreement entered into by petitioner and its subscribers, as well as the accounting and business practices of petitioner. Since "all the surrounding circumstances" are relevant for purposes of proving intent, we find that each of these inquiries was proper.[14]

In *Continental Cablevision of Michigan, Inc v City of Lansing,* unpublished opinion of the Michigan Tax Tribunal, decided September 30, 1982 (Docket Nos. 53491, 64619), as in the instant case, the Tax Tribunal examined the subscription agreement to determine the intention of petitioner, but held that house drops were fixtures for tax purposes. In the instant case, after a reexamination of the agreement, the tribunal reversed itself. We find the tribunal's latter analysis to be more persuasive than the former.

We concur in the tribunal's finding that the agreement lacks any language from which it could be inferred that petitioner intended to relinquish ownership or control of the house drops. There is no language transferring title to or perfecting a gift in the subscriber. On the contrary, paragraph five provides:

> All *repairs and modifications of the system shall be made only by* CCMC *or its authorized agents. Customer agrees not to disturb, tamper with, reroute or in any way interfere with any component*

---

[14] See *Zangerle v Standard Oil Co of Ohio,* 144 Ohio St 506, 518; 60 NE2d 52 (1945).

*of the system* unless authorized by CCMC. Customer further agrees that he will not attach any electric, electronic, or other type device thereto except a standard television or FM radio receiving set. Any unauthorized connection or modification of said installation will be considered a breach of the Agreement and thus cause for disconnection, and CCMC shall be entitled to recover damages for such tampering including, but not limited to, the value of CCMC service obtained without payment, the cost of repair or service, plus reasonable collection costs. [Emphasis added.]

Thus, under the provisions of this paragraph, if a subscriber tampers with the house drop, petitioner may recover from that subscriber the cost of repairing or replacing it. In our view, petitioner's reservation of this right is inconsistent with its claim that it intended the house drops to become the property of its customers upon installation.

Similarly, in paragraph two, petitioner secures the "right to install, maintain, service[,] repair and replace any and all components of the system for the purpose of this agreement on the premises to be serviced." Again, reserving this unilateral right without providing for any additional charge to the customer is further evidence that petitioner intended to maintain ownership and control over the house drops after installation.[15] In paragraph

[15] In an argument not addressed by the Tax Tribunal or the Court of Appeals, petitioner maintains that it reserves the exclusive rights to control and service the house drops, not because the company owns them, but because it is required by the Federal Communications Commission in order to prevent signal leakage. See 47 CFR 76.1 *et seq.* Thus, argues petitioner, reservation of these rights in paragraphs two and five of the subscription agreement is not relevant for purposes of proving intent to retain ownership. In fact, petitioner contends that treating the retention of these rights as evidence of ownership amounts to punishing petitioner for compliance with the FCC regulations.

Unlike Justice LEVIN, we are not persuaded by this argument. The FCC requirements may, indeed, have motivated petitioner to reserve

seven, petitioner also reserves the right to discon-
nect service "at any time without notice and, at
the option of ccmc the converter *or any other
equipment* shall not be deemed . . . aban-
don[ed] . . . ." (Emphasis added.) This provi-
sion provides additional support for the tribunal's
finding that petitioner intended to maintain con-
trol and ownership over the house drops. Finally,
in paragraph nine, petitioner prohibits the sub-
scriber from assigning any of its rights or duties
under the agreement.

Thus, taken as a whole, the service agreement,
which was drafted by petitioner, provides ample
evidence of Continental's intention to retain own-
ership and control over the house drops. On the
face of the agreement, it appears obvious to this
Court that petitioner intended merely to furnish
cable service to customers for a fee. The function
of the property in dispute, the house drops, was
simply to assist in transmitting this service.

Petitioner argues that paragraphs four and six
of the service agreement militate against a finding
that Continental intended to retain ownership and
control over the house drops after installation.
Paragraph six provides that "the customer agrees
to pay all federal, state, and local taxes, if any,
which may in the future be imposed . . . with
respect to service and installation charges for all
equipment except converters." However, at issue
in the instant case is ownership of the house drops
for property tax purposes. Paragraph six speaks
only to paying a hypothetical tax on "service and
installation charges" which may or may not be

the exclusive rights to control and service the house drops. However,
this fact does not negate the other evidence in this case. In our view,
the other evidence of ownership on the part of petitioner is so strong
that the existence of stringent fcc regulations in the area of cable
television does not compel a contrary result in this case.

imposed in the future. Thus, we conclude that paragraph six is inapplicable in the instant action.

Paragraph four expressly reserves in petitioner ownership of the installed converter. Thus, if cable service is terminated, petitioner may enter the premises and recover the converter. Petitioner argues that because ownership of the house drops is not expressly reserved and because the house drops are not ordinarily removed when service is terminated, then petitioner intended the house drops, upon installation, to become the real property of the subscriber.

We find this argument unpersuasive. Recently, in *Chillicothe Cablevision v Limbach,* unpublished opinion of the Ohio Court of Appeals, decided June 5, 1987 (Docket No. 1341),[16] the court held that the cable company retains ownership of installed house drops for property tax purposes. In reaching its result, the court discussed two prior tax commission cases, *In re Telerama,* unpublished opinion of the Ohio Tax Commission, decided January 8, 1975 (Docket No. 13269), holding that "set connectors" (synonym for "house drops") are fixtures because the cable company made no claim of ownership to or control over them, and *Communication Properties, Inc v Lindley,* CCH Ohio Tax Rpts 200-245 (Ohio Board of Tax Appeals, Docket No. 77-C-60) (August 15, 1978), holding that house drops are the personalty of the cable company since the company specifically reserved ownership of them in its service agreement.

*Chillicothe, supra* is analogous to the instant case because neither cable company expressly reserved ownership of the house drops. However,

---

[16] Although decisions of sister states, whether reported or unreported, are not binding upon this Court, nonetheless we find the *Chillicothe* analysis to be persuasive in this case of first impression. *Chillicothe* is precisely on point and has been cited in the briefs before this Court. (Available on LEXIS, State Library, Ohio file.)

instead of concluding that Chillicothe Cablevision intended the house drops to become permanent accessions to the realty, the court reasoned, and we agree, that no authority requires such an explicit reservation of ownership in order for the house drops to remain the personal property of the cable company. Our task, again, is to examine *all* of the surrounding circumstances in order to determine petitioner's intent.

In the instant case, the Tax Tribunal and the Court of Appeals examined petitioner's business and accounting practices in order to determine its intention regarding the house drops. Similarly, in *Comcast Cablevision, Inc v Sterling Heights,* unpublished opinion of the Michigan Tax Tribunal, decided August 20, 1987 (Docket No. 89712), the tribunal examined the company's trade and bookkeeping customs[17] and concluded that house drops are the taxable personal property of the cable company.[18] Other states faced with this issue have also examined such practices in order to determine the intention of the cable company. See, e.g., *Chillicothe, supra; Horizon Communications Corp v Schneider,* unpublished opinion of the Missouri Tax Commission, decided January 22, 1987 (Docket No. 84-10083).

Evidence introduced at the hearing, in the case at bar, demonstrated that a subscriber pays $14.95 to have a house drop installed. However, the actual cost to petitioner for labor and materials is $40. Petitioner does not remove the house drops when service is terminated unless the customers

---

[17] As in the case at bar, the tribunal in *Comcast* also examined the language of the subscription agreement entered into by the cable company and its customers.

[18] In *Continental Cablevision v City of Lansing, supra,* on the other hand, the tribunal failed to examine the company's books and trade practices. Therefore, because the tribunal ignored the economic realities of the cable industry, it concluded that house drops were fixtures.

so request. Instead, service is disconnected at the main cable. When a person moves into a residence having an existing house drop, the charge to reconnect is only $10. Petitioner claims that its failure to remove the house drops is evidence of its intent to abandon and relinquish ownership of them. We disagree and concur in the tribunal's finding that the house drops are left in place not because of ownership by the subscriber, but because it would be too expensive to remove the house drops each time service is terminated. We conclude, therefore, that petitioner has made a conscious business decision to leave the house drops intact as an incentive to future residents to subscribe. See *Chillicothe, supra.*

Further evidence of petitioner's intent to retain ownership of the installed house drops is the company's practice of carrying house drops on its books as depreciable capital assets and taking deductions for them on its federal and state income tax returns.[19] At the hearing, an accounting expert testified that these practices are wholly inconsistent with the claim that petitioner does not own the house drops.

Petitioner argues that listing house drops on the company books as depreciable assets and deducting their value for income tax purposes is not controlling as to the issue of ownership. See *Tele-Vue Systems, Inc v Contra Costa Co,* 25 Cal App 3d 340; 101 Cal Rptr 789 (1972); *Bylund v Dep't of Revenue,* 9 Or Tax Rptr 76 (1981).[20]

---

[19] Petitioner capitalizes and depreciates the labor and material costs involved with the house drops over a period of time. Petitioner also treats the house drops as capitalized costs for federal and state tax return purposes. Michigan Tax Tribunal opinion, p 5.

[20] "[T]he classification of property for purposes of ad valorem taxation, and the income tax laws and regulations relating to depreciation deductions, are based on entirely different concepts." *Tele-Vue, supra,* p 345.

While we agree that petitioner's tax and accounting practices are not *controlling* in this case, we find, nonetheless, that such practices are *relevant* for the purpose of proving petitioner's intention. We reiterate that "all the surrounding circumstances" must be examined in determining Continental's intention regarding the house drops.

Under the provisions of 26 USC 167, depreciation is an allowance for deterioration of income-producing assets. The theory of depreciation assumes that property wears out with use and age and will have to be replaced. Ordinarily, only the owner of the asset suffers wear and tear and, therefore, only the owner is eligible for depreciation deductions. *Urbanek v United States,* 731 F2d 870, 874, n 7 (CA Fed, 1984), cert den 469 US 1034 (1984).

Petitioner cites three cases for the proposition that a person need not own property in order to claim depreciation deductions. However, in each of these cases, the person claiming the deduction had rights in the property equivalent to legal ownership.

In *Helvering v F & R Lazarus & Co,* 308 US 252; 60 S Ct 209; 84 L Ed 226 (1939), the taxpayer, although not the legal titleholder, possessed a lease interest in the property for ninety-nine years. Similarly, in *Gladding Dry Goods Co v Comm'r,* 2 BTA 336 (1925), the taxpayer had a lease interest giving him beneficial use of the property taxed. Finally, in *Loveman & Son Export Corp v Comm'r of Internal Revenue,* 34 TC 776 (1960), aff'd 296 F2d 732 (CA 6, 1961), cert den 369 US 860 (1962), a taxpayer, who had constructed a paved road, title to which was technically vested in the local municipality, was allowed to depreciate it. The commission allowed the depreciation because the road was built by the taxpayer, was

necessary to the operation of the taxpayer's business, and was of no real use to anyone other than the taxpayer.

Thus, while we do not find controlling the fact that petitioner claims depreciation deductions for the house drops and lists them as assets on the company books, we do find that such practices provide additional support for the tribunal's finding that petitioner intended to retain ownership of and control over the house drops after installation.

Respondent urges this Court to treat house drops as other utility drops for purposes of taxation. MCL 211.8(g); MSA 7.8(g) provides:

> For the purposes of taxation, personal property shall include:
>
> * * *
>
> (g) The personal property of gas and coke companies, natural gas companies, electric light companies, waterworks companies, hydraulic companies, and pipe line companies transporting oil or gas as public or common carriers, to be assessed in the township, village, or city where the personal property is located. *The mains, pipes, supports, and wires of these companies, including the supports and wire or other line used for communication purposes in the operation of those facilities, and the rights of way and the easements or other interests in land by virtue of which the mains, pipes, supports, and wires are erected and maintained, shall be assessed as personal property in the township, village, or city where laid, placed, or located.* [Emphasis added.]

Thus, from the language of this ninety-five-year-old statute, ordinary utility lines and supports are to be assessed as personal property of the utility company. Although cable companies are not specifically listed along with other public utilities under

subsection 8(g), case law suggests that cable television may be a public utility for taxation purposes.

In *White v Detroit Edison Co,* a companion case to *White v Ann Arbor,* 406 Mich 554; 281 NW2d 283 (1979), this Court held that cable television is a public utility within the meaning of the Subdivision Control Act.[21] MCL 560.102(1); MSA 26.430(102)(l) defines a public utility:

> "Public utility" means all persons, firms, corporations, copartnerships or municipal or other public authority providing gas, electricity, water, steam, telephone, sewer, or other services of a similar nature.

Since cable television was not listed in subsection 102(l), we concluded that it could only be deemed a public utility if it is an "other service[ ] of a similar nature" to one of those listed in the statute. Construing subsection 102(l) in a manner so as to carry out the intention of the Legislature, this Court reasoned that cable television is "similar" to telephone service since both transmit communication signals along power lines. Thus, for purposes of the Subdivision Control Act, cable television is a public utility.

On the other hand, in *White v Ann Arbor, supra,* we held that a cable system is not a public utility within the meaning of Const 1963, art 7, § 25, which provides:

> No city or village shall acquire *any public utility furnishing light, heat or power,* or grant any public utility franchise which is not subject to revocation at the will of the city or village, unless the proposition shall first have been approved by three-fifths of the electors voting thereon. [Emphasis added.]

---

[21] MCL 560.101 *et seq.;* MSA 26.430(101) *et seq.*

From the plain meaning of the words of art 7, § 25 and from a review of the Official Record of the Michigan Constitutional Convention, we concluded that "public utility" is limited to those utilities furnishing light, heat, or power. Thus, for purposes of art 7, § 25, cable television is not a public utility.[22]

In the instant case, we do not view the language of subsection 8(g) to be as constrictive as art 7, § 25 in *White v Ann Arbor;* nor do we view the statute herein to be as open-ended as subsection 102(l) in *White v Detroit Edison.* To date, the Legislature has not included cable television as one of the utilities in subsection 8(g), and we can properly assume that the Legislature did not even contemplate cable television when it drafted subsection 8(g) in 1893.

However, although we agree that cable television is not a "public utility" as defined by the Michigan Constitution, we can find no justifiable rationale for treating house drops differently than other utility drops for purposes of taxation.[23] We find persuasive the analogy between cable televi-

[22] But see *Meridian Twp v Roberts,* 114 Mich App 803; 319 NW2d 678 (1982), where the Court of Appeals held that cable television is a "public utility" for purposes of the franchise provision of the constitution, Const 1963, art 7, § 29. Under this provision, a township may prohibit any person who operates a "public utility" from transacting any business within the township without first obtaining a franchise. The Court of Appeals distinguished art 7, § 25 from art 7, § 29 in that the latter contained no limiting language in its definition of "public utility."

[23] In his dissent, Justice LEVIN criticizes our examination of the manner in which gas and electric utility drops are taxed, claiming that such an inquiry "does not bear on whether Continental intended that cable television house drops installed for its subscribers would become permanent accessions to the realty." *Post,* p 751. However, a thorough reading of the majority opinion reveals that we did not discuss the treatment of other utility drops in this context. We agree with Justice LEVIN that such an inquiry would not be relevant for purposes of proving Continental's intention, and, for this reason, we separately discussed the treatment of other utility drops at the

sion and other public utilities drawn by Justice
MOODY in his concurrence in *White v Ann Arbor,
supra,* p 575:

> Although this limited constitutional definition of
> public utility excludes cable television, it is imper-
> ative to recognize on a practical level that cable
> television possesses all the attributes of a public
> utility. While the term "public utility" has eluded
> precise definition, this Court has defined the term
> as follows:
> "Utility means the state or quality of being
> useful. Was this plant [waterworks company] one
> useful to the public? If so, it was a public utility."
> *Schurtz v Grand Rapids,* 208 Mich 510, 524; 175
> NW 421 (1919).[24]

Furthermore, in *Michigan Consolidated Gas Co
v Michigan Tax Comm,* 4 Mich App 33; 143 NW2d
606 (1966), on remand to the Michigan State Tax
Commission, *In re Appeal No 1524 of Michigan
Consolidated Gas Co,* unpublished proposed order
issued June 6, 1967, where the gas company un-
successfully contested taxes assessed on pipe lines
running from the customers' property lines to the

conclusion of our analysis. In our view, inquiring into the way the
Legislature has treated other utility drops for ad valorem tax pur-
poses is both proper and helpful in determining whether Continental
was properly taxed for the cable house drops in this case.

[24] See also OAG, 1973-1974, No 4808, p 130 (April 25, 1974), where
the Attorney General opined that cable television is a public utility
within the meaning of the Michigan Constitution.

> Specifically, he relied on art 7, § 29 and interpreted the term
> "public utility" to include cable communication systems in
> light of Const 1963, art 7, § 34, which provides that sections of
> the 1963 Constitution as well as state statutes that set forth
> the powers and limitations of counties, townships, cities, and
> villages "shall be liberally construed in their favor. Powers
> granted to counties and townships by this constitution and by
> law shall include those fairly implied and not prohibited by this
> constitution." [*Meridian Twp,* n 22 *supra,* pp 807-808.]

meters attached to the homes (analogous to house drops), the commission stated:

> It is anomalous to contend that the Gas Company, for rate purposes, "owns" that proportion of the service lines for which it has paid but that it has no ownership whatever for purposes of ad valorem taxation. As long as the Michigan Consolidated Gas Company is allowed to deduct the expense of maintaining the service lines and to earn a reasonable rate of return upon its contribution to the service pipelines, it is only right and proper that it suffer taxation thereon.

Accordingly, in the instant case, upon examination of petitioner's subscription agreement, its business and accounting practices, and the treatment afforded to other utilities in the area of taxation, we hold that the findings of the Tax Tribunal are supported by competent, material, and substantial evidence. We, therefore, affirm the decision of the Court of Appeals and hold that the City of Roseville properly assessed to Continental Cablevision a personal property tax for the years 1982, 1983, and 1984.[25]

---

[25] Several recent decisions in other states support the general conclusion that house drops are the personal property of a petitioner for purposes of ad valorem taxation. *Chillicothe, supra; Horizon Communications, supra; Rollins Cablevue, Inc v McMahon,* 361 A2d 243 (Del, 1976); *Warner Amex Cable Communications v Bd of Assessors of Everett,* 396 Mass 239; 485 NE2d 177 (1985); *Country Manors Ass'n v Master Antenna Systems,* 458 So 2d 835 (Fla App, 1984).

Our holding in the instant case is also partially supported by *Tele-Vue Systems, supra,* where the California Court of Appeals held that the "exterior" portion of a house drop (i.e., the part located outside a residence) is owned by and taxable to a cable company. The court, however, drew a novel distinction and concluded that the "interior" section of a house drop (i.e., the part located inside a residence) is assessable to the subscriber.

No other state has adopted California's analysis, and we decline to adopt it here because the issue has not been briefed or argued by the parties and the record before us adequately supports the findings of the Tax Tribunal.

BRICKLEY, CAVANAGH, BOYLE, ARCHER, and GRIF-
FIN, JJ., concurred with RILEY, C.J.

LEVIN, J. (*dissenting*). The general property tax
law provides that "all buildings and *fixtures*
thereon" are taxable as "real property."[1] The ma-
jority states that "[a]ccording to the act, if the
house drops in the case at bar are fixtures, then
they are taxable to the owner or occupant of the
realty. On the other hand, if the house drops are
personalty, then they are assessable against the
owner of the house drops"[2] as "personal proper-
ty."[3]

The majority states that the house drops are
fixtures within the meaning of two of the three
factors determinative of whether property is a
fixture: The parties have agreed that the house
drops are "annexed to the realty" and "adapt[ed]"
to the use of the realty.[4] Accordingly, the analysis
must focus on the third factor, whether it was
intended that the house drops become a "perma-
nent accession" to the realty.[5] The majority con-
cludes that Continental Cablevision did not estab-
lish that it "intended to relinquish ownership and
control over the house drops"[6] and thus failed to
establish that it intended that the house drops
would become permanent accessions to the realty.
The majority summarizes its analysis:

> [I]n the instant case, upon examination of peti-
> tioner's subscription agreement, its business and
> accounting practices, and the treatment afforded

[1] MCL 211.2; MSA 7.2 (emphasis added).

[2] *Ante,* p 735.

[3] MCL 211.8(a); MSA 7.8(a).

[4] See *Peninsular Stove Co v Young,* 247 Mich 580, 582; 226 NW 225 (1929).

[5] *Ante,* p 736.

[6] *Ante,* p 737.

to other utilities in the area of taxation, we hold that the findings of the Tax Tribunal are supported by competent, material, and substantial evidence.[7]

In my opinion, the only evidence that might support the findings of the Tax Tribunal is the failure of the subscription agreement to provide unequivocally that title, ownership, and control of the house drops are vested in the owners of the realty. Substantial other evidence tends to support Continental's claim that it did relinquish title, ownership, and control.

I

The treatment of gas and electric utility house drops for ad valorem tax purposes, provided by statute,[8] does not bear on whether Continental intended that cable television house drops installed for its subscribers would become permanent accessions to the realty. Nor is it pertinent to an inquiry focusing on Continental's intention whether there is a "justifiable rationale" for treating house drops differently than other utility drops for purposes of taxation.[9] Those are considerations for the Legislature.

II

Continental's accounting practices are not inconsistent with its assertion that it intended that the house drops become permanent accessions to the realty. Although Continental may have preferred to expense the difference between the $40 cost of installation of a house drop and the $14.95 paid by

---

[7] *Ante,* p 749.

[8] See MCL 211.8(g); MSA 7.8(g).

[9] *Ante,* p 747.

the subscriber for installation of a house drop in the year in which the expenditure was made, the Internal Revenue Service apparently takes the position that the difference cannot be expensed but may be depreciated. The federal income tax treatment does not depend on whether Continental retains ownership[10] or, alternatively, whether ownership is vested in the owners of the realty. Even if title to the house drops were to be vested incontrovertibly in the owners of the realty, Continental would be entitled to claim depreciation deductions for the unamortized portion of the difference and could not accelerate the timing of depreciation allowances.

Since the federal income tax treatment and Continental's accounting practices in that regard are controlled by federal law, Continental's attempts to comply with that law as administered by the Internal Revenue Service are not any evidence at all on the question presented whether Continental intended that the house drops become permanent accessions to the realty.

### III

The provisions of the subscription agreement reserving to Continental the right, *during the term of the agreement,* to repair and replace all components, including house drops, connected to its cable system, and precluding the customer, *during the term of the agreement,* from interfering with the system, are not inconsistent with Continental's assertion that the house drops had become permanent accessions to the realty. These provisions of the subscription agreement seek to provide a means of maintaining the integrity of the cable system and of complying with Federal

[10] 3 CCH Federal Tax Reporter, ¶ 1715.23.

Communications Commission regulations[11] designed to prevent signal leakage that might interfere with other communications including flight control systems. Continental's efforts to comply with federal regulations do not tend to negative Continental's assertion that it intended that the house drops become permanent accessions to the realty.

Continental would have the same obligation to comply with FCC regulations if the house drops had been installed by the owner of the realty. Continental's obligation arises under federal law when the house drop—without regard to who installs, owns, or otherwise controls it—is connected into its cable system.

The subscriber-owner of the realty can terminate the asserted ownership and control of Continental at will, after any notice that is provided for in the subscription agreement. Once the subscription agreement is terminated, the subscriber-owner of the realty may do whatever he may wish with the house drop. Continental would then have no further right to maintain, repair, or alter the house drop. Continental has never sought to exercise rights over house drops following termination of service to a subscriber and has never removed a house drop except to repair or replace it. Continental expressly reserves ownership in and the right to remove the converter, thereby indicating, under established rules of contract construction, that it did not intend to retain ownership of the house drops.

IV

There is no reason to suppose that Continental would desire to retain ownership of the house

---

[11] 47 CFR 76.601 *et seq.*

drops.[12] There is no advantage to Continental in retaining ownership[13] or in retaining control beyond such control as may be required by FCC regulations during such periods of time that a house drop is connected to Continental's cable system.

Continental has every reason to relinquish ownership and all other control. No law bars it from doing so. If it is felt that there is an avoidance of taxation[14] that requires a governmental response, the appropriate forum for that effort is the Legislature.[15] Until the Legislature acts and as long as the question turns on and focuses on Continental's intention, Continental is free to draft the subscription agreement to effect a transfer of ownership and control. There is no reason to question the bona fides of Continental's assertion that it has relinquished title, ownership, and control of the house drops.[16] There is no basis in the record for concluding that Continental acted inconsistently

[12] Suppose a house drop falls to the ground through no fault of Continental, that this occurs after a subscription agreement terminates, and a person is injured. The majority's analysis might subject Continental to tort liability therefor.

[13] The experience is that few subscribers or owners interfere with house drops after a subscription agreement terminates, and the house drops will ordinarily be in place should the subscriber-owner or a subsequent subscriber-owner desire Continental to reconnect into its cable television system.

The majority notes that where there is an existing house drop, the connection charge is $10 rather than $14.95. *Ante,* p 743. The majority states "that petitioner has made a conscious business decision to leave the house drops intact as an incentive to future residents to subscribe." *Id.* That does not, however, negative an intention to transfer title, ownership, and control to the owner of the realty.

[14] Continental could require its subscribers to pay, directly or indirectly, any property tax that might be assessed against it.

[15] The majority does not predicate its decision on an asserted need to prevent tax avoidance. It holds rather that the house drops are not fixtures because Continental did not intend to relinquish ownership and control.

[16] See *T-V Transmission, Inc v Pawnee Co Bd of Equalization,* 215 Neb 363; 338 NW2d 752 (1983).

with its assertion that it intended that the house drops become permanent accessions to the realty.

I would reverse and remand this cause to the Tax Tribunal for further proceedings consistent with this opinion.