COMCAST CABLEVISION OF STERLING HEIGHTS, INC v CITY OF STERLING HEIGHTS

Docket No. 177513. Submitted April 16, 1996, at Lansing. Decided July 26, 1996, at 9:25 A.M.

Comcast Cablevision of Sterling Heights, Inc., filed a petition in the Michigan Tax Tribunal, challenging the assessments for tax years 1992, 1993, and 1994 of personal property taxes by the City of Sterling Heights for "house drops," a portion of the company's cable system that extends from its main cables into subscribers' homes, claiming that the house drops are fixtures taxable to each subscriber. The Tax Tribunal agreed with Comcast and ordered the city's assessments revised. The city appealed.

The Court of Appeals *held*:

1. The Tax Tribunal properly determined that the house drops were not assessable as Comcast's property. The tribunal properly applied three criteria (annexation, adaptation, and intention) to determine whether the house drops were a permanent accession to or fixture upon the property of subscribers. Both ownership and control were properly considered in determining whether Comcast's intent is that house drops become the property of subscribers.

2. The ambiguous requirement in the parties' franchise agreement that Comcast must maintain control of the "cable system" should not be interpreted as including house drops. The parties' conduct has shown that it was not their intent that the agreement be interpreted to prevent the transfer of control of the house drops to the subscribers.

3. The subscriber agreement clause specifically transferring ownership of the house drops to the subscribers, along with Comcast's treatment of the house drops as a cost rather than a depreciable asset, suggest that ownership is in the subscriber.

Affirmed.

TAXATION — FIXTURES — REAL PROPERTY.

The factors for determining whether a "house drop," the extension from a cable company's main cable into the subscriber's home, is a fixture taxable to the subscriber as real property, are the degree of annexation to the realty, the nature of the adaptation, and the

> intention of the cable company; both ownership and control must be considered in determining whether it is the intent of the cable company that the house drop become the property of the subscriber.

*Foster, Swift, Collins & Smith, P.C.* (by *Kenneth T. Brooks*), for Comcast Cablevision of Sterling Heights, Inc.

*O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C.* (by *Pauline S. Baleda*), for the City of Sterling Heights.

Before: MICHAEL J. KELLY, P.J. and BANDSTRA and S. B. MILLER,* JJ.

BANDSTRA, J. The City of Sterling Heights appeals as of right from an assessment revision rendered in favor of Comcast Cablevision of Sterling Heights, Inc., by the Michigan Tax Tribunal. We affirm.

This case stems from a dispute regarding the tax treatment of the value of cable "house drops" installed by Comcast to connect its cable television subscribers to the Comcast cable system. The parties are largely in agreement regarding the relevant facts, which were stipulated below. Under the stipulation, a "house drop" is defined as follows:

> The cable which extends from a tap in a feeder cable, into the subscriber's premises, then connected to the cable ready television or converter box, as applicable. The cable runs either aerially or underground. If the cable runs underground, then the house drop begins at the CATV "pedestal" and continues to run underground to a ground block which is affixed to the residence. Trenching equipment is used to bury the cable at a minimum of 8 inches beneath the

---

* Circuit judge, sitting on the Court of Appeals by assignment.

ground surface. If the cable runs aerially, then the house drop starts at a public utility pole and extends to the subscriber's premises. The house drop then traverses the side of the structure and is physically affixed by clamps, hooks, bolts or similar connecting devices. The length of the cable depends upon, among other things, the size and configuration of the structure. A small hole is drilled into the side of the structure to permit the house drop to enter the structure and the house drop is affixed to joists or fished through the hollow of an interior wall to the room in which the cable service is desired.

A house drop does not include the "converter box" that is located on or near the television or televisions within a structure. Although the cost of a house drop to Comcast varies from customer to customer, depending on individual labor and material requirements, the average labor and material expenses associated with a house drop is $50 per subscriber. Comcast imposes a $50 installation charge on some subscribers, but not others. When Comcast cable service is terminated, a house drop installed by Comcast on a subscriber's property is not removed; it can be removed, retained, or used for another purpose at the discretion of the former subscriber.

Since 1989, Comcast's accounting practice has been to expense the costs associated with subscriber installations. In other words, Comcast does not carry house drops on its books as a fixed asset. Further, Comcast treats the house drops as expense items for federal and state income tax purposes. Before 1989, Comcast capitalized and depreciated the costs associated with subscriber installations and treated those costs as capitalized assets for federal and state income tax purposes.

Comcast provides cable services to residents of Sterling Heights pursuant to a franchise agreement between Comcast and Sterling Heights, as required by a Sterling Heights ordinance. In addition, Comcast enters into subscriber agreements with individual customers. The agreement used by Comcast since January 1, 1991, includes the following clause:

> All cable, connectors and mounting hardware installed by Company shall, upon installation, become a fixture on the premises and shall become the property of the owner of the premises. Subscriber acknowledges ownership of such equipment. All other equipment installed by Company, including but not limited to the converter(s) indicated on the face side, any security devices or amplification equipment and all remote control units provided to Subscriber by Company shall at all times remain the property of Company.

This agreement has been used by Comcast since January 1, 1991, both for new subscribers and for renewal customers.

The parties do not disagree regarding the value of the house drops. At issue is whether the value of the house drops is assessable to Comcast for personal property tax purposes for tax years 1992, 1993, and 1994. The Tax Tribunal determined that the house drops are not assessable to Comcast, but, rather, that they are the property of subscribers. Our review in this matter is limited to determining whether the tribunal made an error of law or adopted a wrong principle; the factual findings of the tribunal are final, provided they are supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Meadowlanes Limited Dividend Housing Ass'n v Holland*, 437 Mich 473, 482-483; 473 NW2d 636 (1991).

On the basis of *Continental Cablevision of Michigan, Inc v Roseville*, 430 Mich 727, 735-736; 425 NW2d 53 (1988), the Tax Tribunal applied three criteria (annexation, adaptation, and intention) to determine whether the house drops were a permanent accession to or fixture upon the property of subscribers. As in *Continental, supra* at 736-737, the Tax Tribunal concluded that the annexation and adaptation criteria were satisfied and that resolution of the issue hinged upon a determination of the annexing party's intent.[1] The tribunal determined that Comcast's intent is that ownership of house drops is transferred to subscribers, as evidenced both by the specific subscriber agreement language to that effect and Comcast's accounting practices. This decision was directly in opposition to that reached in *Continental*, where the subscriber agreement had no language making house drops the property of subscribers and the cable company treated house drops as depreciable capital assets. *Id.* at 737, 743.

On appeal, Sterling Heights first argues, in effect, that the tribunal was precluded from reaching this result because the tribunal had previously determined, in a 1987 opinion, that house drops installed by Comcast remained the property of Comcast for property tax purposes. While acknowledging that Comcast's current subscriber agreement[2] and

---

[1] The "essential inquiry" is "whether the annexing party . . . intended to relinquish ownership and control over the house drops," *Continental, supra* at 737, making Sterling Heights' arguments regarding the intent of subscribers inapposite.

[2] Sterling Heights acknowledges that Comcast has used the stipulated subscriber agreement since January 1, 1991, but argues that the provision of that agreement transferring house drops to subscribers should not have "retroactive application" to then-existing subscribers who have not since

accounting practices are different than they were in 1987, Sterling Heights argues that these changes were made by Comcast "merely . . . to avoid paying taxes on its property." However, even assuming this is true,[3] business practices are often changed for tax reasons. Sterling Heights presents us no authority to conclude that we can ignore Comcast's business changes in determining whether the Tax Tribunal correctly determined that the house drops were not assessable as Comcast's property.

Sterling Heights further argues that the Tax Tribunal misapplied *Continental* by concentrating on the factual support for Comcast's argument that it transfers ownership of house drops to subscribers, without adequately considering whether Comcast transfers control over house drops. We agree with Sterling Heights that both ownership and control must be considered in determining whether Comcast's intent is that house drops become the property of subscribers.

---

renewed their subscription or reconnected with Comcast. This same argument was made below and, at one stage of the proceedings, Sterling Heights further argued that the 1991 agreement should only be applied to new customers who first purchased Comcast services after January 1, 1991. The Tax Tribunal fully considered these arguments upon Sterling Heights' motion for reconsideration of the Tax Tribunal's decision and concluded that Sterling Heights' position was inconsistent with the stipulation of facts entered by the parties. We conclude that this determination was supported by competent, material, and substantial evidence on the record and will not disturb it on appeal. *Meadowlanes, supra.*

[3] Comcast argues that these changes were not merely implemented for property tax purposes and that they have real business consequences apart from the extent of Comcast's property tax liability. For example, if a house drop is the property of a subscriber, that subscriber can discontinue its relationship with Comcast and use the house drop, for example, to receive telecommunications signals through a satellite dish or from another cable company. Further, as already noted, Comcast treats house drops as costs, not assets, for purposes of income tax filings.

*Id.* at 737. However, we disagree with Sterling Heights regarding the correct result of that analysis.

Sterling Heights points out that the franchise agreement it entered into with Comcast requires that Comcast must maintain control over the "cable system." This is an undefined and ambiguous term that may or may not extend to the house drops at issue here. Sterling Heights contends that this term includes house drops and further argues that this shows that the intent of the subscriber agreement cannot be that control of house drops is relinquished by Comcast. However, the franchise agreement further states that Comcast "shall comply with all FCC rules and regulations" applicable to cable communications systems, and a Federal Communications Commission rule requires that a subscriber must be given the opportunity to purchase "cable home wiring" during or upon termination of a subscriber agreement. 47 CFR 76.802. We conclude that Comcast must, therefore, relinquish control of "cable home wiring" to a subscriber exercising the right to purchase, especially when a subscriber agreement is terminated. A contract should be interpreted in a manner that does not produce an unnatural result. *In re Loose,* 201 Mich App 361, 367; 505 NW2d 922 (1993), remanded on other grounds 447 Mich 1005 (1994). The ambiguous requirement of the franchise agreement that Comcast must maintain control of the "cable system" should not be interpreted as including house drops. "Cable home wiring" is at least a part of a house drop, and the franchise agreement, interpreted as Sterling Heights argues, would run afoul of the FCC requirement.

Further, Comcast informed Sterling Heights, at the beginning of 1992, that it considered "beneficial ownership" of house drops to be transferred to subscribers. Sterling Heights raised no argument that this transfer, presumably including a transfer of control, was in violation of the franchise agreement. We will not conclude that the franchise agreement's requirement regarding maintaining control of the "cable system" includes the house drops at issue here because the parties by their conduct have shown this was not their intent. *Rasheed v Chrysler Corp*, 445 Mich 109, 127, n 28; 517 NW2d 19 (1994); *In re Loose, supra.*

Sterling Heights argues that federal regulations require that Comcast must retain rights necessary to preserve the integrity of its cable signal. Sterling Heights argues that this means that Comcast cannot relinquish control over house drops to subscribers. We disagree. The only control that Comcast must retain is the control required to preserve the integrity of its signal, i.e., to make whatever repairs are necessary to prevent signal leakage. In contrast to the control over a house drop given up by Comcast to a subscriber, this limited purpose control, retained as required by federal authorities, is inconsequential. Further, although Comcast in its subscriber agreement retains the right to "repair and maintain any equipment installed . . . [i]n order to ensure compliance with applicable laws and performance standards," the "Subscriber shall be responsible for the repair and maintenance of any equipment purchased by Subscriber." Comcast is thus given the right to charge subscribers for repairs it makes to protect against signal leakage from house drops, further evidence that house drops are in the ownership and con-

trol of subscribers. Compare *Continental, supra* at 739 (Retaining the right to make repairs "without providing for any additional charge to the customer" was considered evidence that the cable company maintained control over house drops.).[4]

To summarize our decision thus far, we agree with Sterling Heights that both ownership and control must be considered in determining whether the house drops at issue should be assessed to Comcast. The subscriber agreement clause specifically transferring ownership to subscribers, along with Comcast's treatment of the house drops as a cost rather than a depreciable asset, suggest that ownership is in the subscriber. These business practices of Comcast are relevant, but not controlling, *Continental, supra* at 744, and we have also considered Sterling Heights' arguments that Comcast has not relinquished sufficient control over the house drops to avoid being assessed taxes for them. For the reasons stated, we conclude that these arguments are not persuasive.

Finally, Sterling Heights argues that, notwithstanding the above analysis, which we consider to be required by *Continental*, we should conclude that the house drops are taxable to Comcast because the *Continental* majority further stated "we can find no justifiable rationale for treating house drops differently

---

[4] Sterling Heights further argues that provisions of the subscriber agreement, the Sterling Heights city code, a state statute (MCL 750.540c; MSA 28.808[3]), and a federal statute (47 USC 533), all of which protect Comcast from having its signal stolen, somehow suggest that ownership or control of house drops is Comcast's rather than a subscriber's. We do not conclude that these authorities assume or in any other way suggest that a house drop belongs to Comcast rather than a subscriber; they simply proscribe the abuse of any part of a cable system that is the property of Comcast for the purpose of stealing a signal.

than other utility drops for purposes of taxation." *Id.* at 747. We disagree. The *Continental* majority made this statement after having considered the cable company's intent regarding ownership and control, a question having nothing to do with how other utility drops are treated for purposes of taxation. *Id.* at 747-748, n 23. The *Continental* majority was thus merely saying that its decision, i.e., that the cable company before it should be assessed taxes for house drops on the facts presented, was consistent with the treatment afforded other utility companies. We do not read this to mean that, when different facts require that a house drop be considered an accession to and fixture upon a subscriber's property under the preceding analysis of *Continental*, a cable company should nonetheless be assessed taxes for the house drop because that is the way other utility drops are treated. In other words, just because the *Continental* majority noted that its treatment of the cable company before it was similar to the treatment afforded other public utilities by statute,[5] a different cable company, presenting different facts regarding its intent with regard to the ownership and control of house drops, need not be treated in the same manner as other public utilities.

Upon examination of Comcast's subscriber agreement, its business and accounting practices, and all the surrounding circumstances in this case, we hold that the findings of the Tax Tribunal are supported by competent, material, and substantial evidence. The

---

[5] The *Continental* majority did not conclude that MCL 211.8(g); MSA 7.8(g) applies to cable television companies. *Id.* at 747.

decision of the Tax Tribunal revising the assessments at issue in this case is affirmed.