[Civ. No. 29683. First Dist., Div. One. May 5, 1972.]

TELE-VUE SYSTEMS, INC., et al., Plaintiffs and Appellants, v. COUNTY OF CONTRA COSTA, Defendant and Respondent.

## COUNSEL

Joseph B. Harvey for Plaintiffs and Appellants.

John B. Clausen, County Counsel, and Paul W. Baker, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**ELKINGTON, J.**—The basic facts on this appeal are not disputed.

Plaintiffs Tele-Vue Systems, Inc. and Contra Costa Cable Co. provided master television antennas at high, relatively unobstructed, points and then transmitted signals through a system of cables carried on utility company poles to the homes of subscribers to their service. At the terminal points a cable was suspended from a utility pole's crossarm to the subscriber's home in much the same fashion as the usual telephone or electrical connection. The cable then entered the home in which it, and related wiring

and equipment, were fastened by means of clamps, screws, bolts, and other means of attachment. When new construction afforded an opportunity, the interior work was concealed in the manner of inside electric wiring. Within the home the system terminated in one or more wall outlets at locations desired by the subscriber.

The portion of the system extending from the utility pole and into the home was known as a housedrop. For such a housedrop plaintiffs made charges of $25 for the installation with $10 for each additional outlet. The subscribers were then charged monthly for service at the rate of $5 for one, and $1 for each additional, outlet.

Plaintiffs made no claim of ownership to, or control over, the portion of the housedrop within the home (the "interior housedrop"). Service might be discontinued at will at any time. If service was discontinued the system was simply disconnected at the utility pole; nothing was removed. The subscriber could do anything with the interior system he wished; he had full control over it. Some subscribers even hooked it up to their own rooftop antennas; there was no agreement preventing this. He could him-self, without charge, add new outlets to it, but in this event good reception was not guaranteed, since unless the work was professionally done the picture quality was lowered. If the service was discontinued, and then resumed by the same or a different subscriber, the housedrop was recon-nected at the pole and a $10 "reconnect" charge was made. Upon discon-tinuance of service plaintiffs did not remove any part of the wiring or equipment. They had no agreement whatever with the subscriber "over what could be done with the equipment." No claim for any portion of the equipment had ever been asserted against a subscriber by plaintiffs. They did, however, maintain and repair the housedrops without charge in order to maintain the quality of the service.

The material and labor costs for the original installation of the house-drops were carried on plaintiffs' books as capital assets and were deducted from their income for federal income tax purposes as depreciation. The costs of materials and labor to repair or replace housedrop equipment were deducted on plaintiffs' income tax returns as an expense, and were not carried on their books as depreciable assets for tax purposes.

The average per unit cost to plaintiffs of installing the housedrop was $12.96, which cost was reported to the county assessor. These costs were further broken down to $7.95 for the interior housedrop and $5.01 for the outside portion. Plaintiffs conceded that the exterior portion was tax-able to them, but contended that the remainder was not.

Plaintiffs were thereafter assessed and taxed on the basis of the cost

to them of both the exterior and interior portions of the housedrops. The taxes were paid, and the instant action was thereafter commenced for refunds of those "erroneously levied and collected" on the interior housedrops.

Following a trial, judgment was entered denying plaintiffs' prayers for refunds. The instant appeal is from that judgment.

Plaintiffs contend that the evidence before the trial court conclusively established that the interior housedrops: (1) were "fixtures," and therefore "improvements" and "real property" owned by the customer, and (2) were neither owned, claimed, possessed, nor controlled by plaintiffs.

■ "It is well settled that for purposes of taxation the definitions of real property in the revenue and taxation laws of the state control whether they conform to definitions used for other purposes or not . . . ." (*Trabue Pittman Corp.* v. *County of L. A.,* 29 Cal.2d 385, 393 [175 P.2d 512].)

Revenue and Taxation Code section 104 provides that "real property" includes, among other things, *"Improvements."* (Italics added.)

Section 105 of the same code states that "Improvements" includes all "buildings, structures, *fixtures,* and fences erected on or affixed to the land, . . ." (Italics added.)

Civil Code section 660 provides, as relevant here, that "A thing is deemed to be affixed to land when it is . . . permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts or screws; . . ."

■ The court in *San Diego T. & S. Bank* v. *San Diego,* 16 Cal.2d 142, 149 [105 P.2d 94, 133 A.L.R. 416], pointed out "the three tests which have often been used by this court in determining whether or not an article is a fixture—namely: (1) the manner of its annexation; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation. . . ."

■ Applying the foregoing rules it becomes obvious, under the undisputed evidence, that the interior housedrops became part of the real property occupied by plaintiffs' subscribers.

Another relevant statute is Revenue and Taxation Code section 405 which provides: "Annually, the assessor shall assess all the taxable property in his county, except state-assessed property, to the persons owning, claiming, possessing, or controlling it on the lien date."

Here, as clearly established by the evidence, plaintiffs neither owned, nor claimed, nor possessed, nor controlled the property here at issue.

Indeed, the county no longer makes any real contention to the contrary, for in its brief on this appeal it states as the "Issue Presented," the following: "May a local assessor include costs of materials installed in the homes of subscribers of a cable television system when appraising the entire system by means of a reproduction cost approach?"

We now discuss the issue as presented by the defendant County of Contra Costa on this appeal.

The county's contention is that each of plaintiffs' systems "was assessed at a single figure representing the total value of the system as a complete operating unit. . . ." They say that the actual ownership of the interior housedrops was irrelevant since the system's value was enhanced by being connected to such housedrops, in the same manner that "a residence is enhanced in value when connected to a sewer or water system owned by others, . . ." It is then argued "that the summation of construction costs of an entire operating system is the proper method of valuing that system so long as the taxpayer retains the beneficial use of all the elements constructed."

From our review of the record it becomes clear that the county assessor chose not to assess plaintiffs' property at its value as a complete operating unit. Instead, it appears that plaintiffs, in the "written property statement" required by Revenue and Taxation Code section 441, separately listed the several forms of personal property, and their costs. Among these items were listed the housedrops with their costs and a statement that the inside portions were not considered taxable. To each of these classes of property the assessor applied a combination depreciation and assessment ratio to their costs as shown on plaintiffs' books. Adding all of these separate assessed valuations of each system's property the total assessment of the system was determined.

At the trial there was no evidence, or contention, that the systems were assessed at their value as operating units—or that their assessed value would have been the same if the cost or value of the interior housedrops had been excluded from consideration.

We note further in the trial record the statement of counsel for the county, "What is not at issue before the court today, as I understand the pleadings, is the total value of the systems"; also his stipulation that the "book costs of the housedrops" were the assessment factors applied by the assessor. And uncontradicted testimony established that the assessor indicated "he was going to assess the housedrops" to plaintiffs.

The county makes no contention that plaintiffs' practice of carrying the housedrops on their books as capital assets for federal income tax purposes constituted evidence of ownership. Its silence undoubtedly results from a recognition that the classification of property for purposes of ad valorem taxation, and the income tax laws and regulations relating to depreciation deductions, are based on entirely different concepts.

From our consideration of the foregoing we conclude that the interior housedrops were improperly assessed to plaintiffs and that the trial court erred in ruling otherwise.

We are unpersuaded by the county's suggestion that the cause must now be remanded to the county board of equalization for "further valuation proceedings." No error is found in the county's valuation proceedings; it occurred in the *assessment* of the interior housedrops to plaintiffs. It was said in *Associated Oil Co.* v. *County of Orange,* 4 Cal.App.2d 5, 9 [40 P.2d 887]: "While in one sense it is true that almost any mistake which results in an excessive assessment amounts to an overvaluation of the property of a taxpayer, we think there is a real and distinct difference between those cases in which it may properly be said that the error is one of overvaluation and those cases in which the overvaluation is a mere incidental result of an erroneous assessment of property which should not have been assessed. . . ." And the court in *Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157, 165 [272 P.2d 16], said, "[W]here the taxpayer attacks the assessment as void because he does not own the property on which the tax demand was made, there is no question of valuation which must be presented first to the board of equalization for correction as a condition for judicial relief. . . ."

The judgment is reversed; the superior court on appropriate findings will enter judgment for plaintiffs for such amounts as, consistent with this opinion, are found due.

Molinari, P. J., and Sims, J., concurred.