607 A.2d 110

## STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

v.

## METROVISION OF PRINCE GEORGE'S COUNTY, INC.

No. 1450 Sept. Term, 1991.

Court of Special Appeals of Maryland.

May 29, 1992.

**196**

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief) Baltimore, for appellant.

Todd K. Snyder, Stephen L. Owen and Venable, Baetjer and Howard for amicus curiae, Television Ass'n of Maryland, Delaware, and the District of Columbia, Inc.

Robert H. Rosenbaum (Cathleen F. Ward and Meyers, Billingsley, Shipley, Curry, Rodbell & Rosenbaum, P.A., on the brief) Riverdale, for appellee.

Argued before Moylan, Bishop and MOTZ, JJ.

MOTZ, Judge.

This case involves the questions of whether the cost of "drop cables" installed by a cable television company and the "make ready" costs of the company are subject to the State's personal property tax.

(i)

Appellee, Metrovision of Prince George's County, Inc. (Metrovision), is a cable television company servicing 58,000 homes in southern Prince George's County. The "drop cables" in dispute consist of cables running from a tap in a feeder cable, which is attached to preexisting utility poles, to the homes of subscribers. The cable is attached to the subscriber's home by a "screw hook," passed through a hole drilled in the exterior wall, and attached to joists or fished through the hollow of an interior wall. The cable is connected directly to a cable-ready television or through a converter box to a television that is not cable-ready.

Metrovision incurs costs to insure the safety of the utility poles across which it runs its wires. These "make ready costs" consist of reimbursement to various utility companies for costs incurred for pre-inspection, adaptation for cable use, and post-inspection of their utility poles. The charges are determined by agreement between Metrovision and the utilities and are made even for those poles for which the utility performed no work, other than inspection. The "make ready" process is primarily a safety measure, without which the utilities would not permit Metrovision to place wires on the poles. Metrovision also pays to the utilities a rental fee for the use of the poles in delivering its service to the subscriber.

Upon completion of the installation, the subscriber signs a work order and an enrollment agreement. These documents indicate that the converter box is the property of Metrovision and that the subscriber must return it when service is terminated. They also authorize Metrovision to come into a subscriber's premises to inspect, repair, replace, or remove the converter box at any time for failure to make a monthly payment. Neither document mentions the drop cable or its ownership status; however, while a subscriber continues service, Metrovision maintains the cable. If a subscriber discontinues service, the cable is disconnected at the tap, but not removed. Metrovision does not restrict the subscriber's use of the cable either while it is connected or after it is disconnected. Metrovision treats both the drop cables and the make ready costs as "Cable Plant and Equipment" on its balance sheet. This line item includes all of Metrovision's physical assets, which are depreciated. The Internal Revenue Service requires the depreciation of drop cables. There is no revenue ruling or regulation requiring the depreciation of make ready costs; a certified public accountant employed by Metrovision testified that he believed that the IRS required cable companies to depreciate the make ready costs.

Appellant, the State Department of Assessments and Taxation (the Department), for the years 1984 through

1987, assessed personal property taxes for the entire cable system, including "drop costs" and "make ready costs."[1] Metrovision paid the taxes, but objected to the part of the assessments attributable to the drop cables and the make ready costs. After a hearing, the Department affirmed the assessments in a final assessment notice, which Metrovision appealed to the Maryland Tax Court. After a hearing on the merits, the Tax Court reversed the assessments on the drop cables and the make ready costs. The Department appealed to the Circuit Court for Prince George's County, which affirmed the decision of the Tax Court.

(ii)

The Department again appeals, urging reversal of the Tax Court on five grounds:

1. Did the Maryland Tax Court properly interpret and apply the test for a fixture?
2. Did the Maryland Tax Court fail to consider all the relevant material and persuasive evidence when applying the test for a fixture?
3. Is the Maryland Tax Court's decision that the cable company owns a property interest in the subscriber's home a determination that is arbitrary and capricious and not supported by the evidence?
4. Is the method of valuation used by the Maryland Tax Court an unrecognized version of the cost approach not designed to produce full cash value?
5. Does the valuation of the cable, according to its highest and best use, require recognition that it is part of a network system?

 As is true in a number of other areas of the law, the standard of appellate review, in large part, determines the result on appeal. When reviewing determinations of

---

**1.** The amounts of the assessments are in 1984, $360,562 drop costs and $422,133 make ready costs; in 1985, $738,622 drop costs and $782,820 make ready costs; in 1986, $721,986 drop costs and $1,222,740 make ready costs; and in 1987, $694,809 drop costs and $786,600 make ready costs.

law decided by the Tax Court, an appellate court is not bound by any presumption of correctness, but may substitute its judgment for that of the Tax Court. *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 626, 547 A.2d 190 (1988) (and cases cited therein). On the other hand, when reviewing factual findings by the Tax Court, the scope of appellate review is narrow because the Tax Court has expertise in this area and should be free to exercise its discretion. *See Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080 (1979); *Finney v. Halle,* 241 Md. 224, 236, 216 A.2d 530 (1966). Thus, if there is "substantial evidence" in the record to support the factual findings, an appellate court should not substitute its judgment for that of the Tax Court. *See Bulluck v. Pelham Woods Apts.,* 283 Md. 505, 512–13, 390 A.2d 1119 (1978); *Bernstein v. Real Estate Comm.,* 221 Md. 221, 230, 156 A.2d 657, *appeal dismissed,* 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960). Moreover, and most significantly in the case at hand, the substantial evidence test is also appropriate when the question on appeal is whether the Tax Court, having a correct understanding of the law, properly applied the law to the facts. *Asbury, supra,* 313 Md. at 627, 547 A.2d 190; *Supervisor of Assessments of Montgomery County v. Group Health Ass'n, Inc.,* 308 Md. 151, 157–58, 517 A.2d 1076 (1986); *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 837, 490 A.2d 1296 (1985).

With these principles in mind, we consider the Department's first three questions involving the status of the drop cables and then the final two questions concerning the "make ready" costs.

(iii)

The parties agree that the proper method to determine whether the drop cables are taxable personal property is application of a fixture analysis under the three-prong common law test for fixtures. That is, if the drop cables are fixtures under this test, they are not personal property

subject to personal property tax; if they are not fixtures, they are personal property subject to the personal property tax.

The Court of Appeals has defined the term "fixture" as "some originally personal chattel which has been actually or constructively affixed either to the soil itself, or some structure legally a part of such soil." *Schofer v. Hoffman,* 182 Md. 270, 274, 34 A.2d 350 (1943). It has outlined a three-part test for determining whether a piece of property is a fixture:

(1) Annexation to the realty, either actual or constructive;

(2) adaptation to the use of that part of the realty with which it is connected;

(3) the intention of the party making the annexation to make the article a permanent accession to the freehold,—this intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed.

*Id.* The Court has long-recognized that the third prong— the intention of the party making the annexation—is the most critical factor:

As a general rule, it may be stated that whether a thing which may be a fixture becomes a part of the building by annexing it, depends upon the intention with which it is done. The character of the physical attachment, whether slight or otherwise, and the use, are mainly important in determining the question of intention of the party making the attachment or annexation.

*Schaper v. Bibb,* 71 Md. 145, 149, 17 A. 935 (1889); *Dermer v. Faunce,* 191 Md. 495, 62 A.2d 304 (1948).

The parties agree that here the first two prongs of the fixture test are satisfied and that the important third prong is dispositive. The Tax Court held that the third prong of the fixture test had been met and classified the cables as realty. The Tax Court found that:

> While there may be an intent to relinquish [cable] drops to the freehold, actual transfer may never be realized. Indeed, due to the drops being treated as [Metrovision's] depreciable assets and the fact that they are continually serviced during the signal subscription, actual transfers of ownership, in some instances (i.e., subscriber never disconnects service), may never occur. However, the *intent* to transfer remains.

(emphasis in original.) The Tax Court explained that a finding that the cables were fixtures rendered "moot" the issue of who owned the cables for purposes of personal property tax assessment.

The Department argues that the Tax Court committed two legal errors in applying the fixture test here. First, the Department claims that the Tax Court erred in "determin[ing] that Metrovision did not actually transfer ownership by the annexation because ownership may never be transferred.... This ... shows that the Tax Court's factual conclusions are inconsistent with its determination that the drop cables were a fixture [sic]. If a drop cable is really a fixture and therefore real property, then it has to be owned by the subscriber."

The short answer is that the Tax Court did not determine the issue of ownership at all for the very reason that it found the fixture analysis determinative of the outcome. Moreover, even if the Tax Court *had* found that ownership had not been transferred at the time of the annexation, this would not affect an analysis under the third prong of the fixture test. "[T]o call a thing a fixture means that it could, in different legal relationships, be considered to be either real or personal property, and could be separately owned by someone other than the owner of the land. ... [W]here a chattel owned by one person is attached to the land of another, there is a double question: has there been a change in ownership under the principles of accession and, *if not*, has there been a sufficient identification of the chattel with the realty so that the chattel might be considered in some transactions to be part of the realty?" A.J.

Casner, 5 *American Law of Property* § 19.1 at 4 (1952) (emphasis added). The second question, of "sufficient identification," is answered by application of the third prong—the intention prong—of the fixture test; the first question of "change in ownership" is a separate matter altogether.[2] Thus, the Tax Court's findings were consistent with proper application of the third prong of the fixture test.[3]

The Department's contention that the Tax Court committed legal error in a second respect by failing to consider all relevant evidence when considering the fixture issue, is equally meritless.[4] Specifically, the Department contends, the Tax Court did not consider all "relevant evidence"

---

2. Indeed, we recognized in *Allentown Plaza v. Suburban Propane Gas Corp.*, 43 Md.App. 337, 405 A.2d 326 (1979) that "contract provisions that a fixture or an improvement are to remain the personal property of the builder or the annexer are valid and controlling." *Id.* at 347, 405 A.2d 326 (footnote omitted). In such a situation, the annexer may have *no intent to transfer ownership*, but still have the intent to make the property a permanent accession. The property would otherwise become a fixture, but the annexor retains ownership of the property because of the contract. *See also* 1 *Thompson on Real Property* § 80 at 345 (1980); 41 Am.Jur.2d, *Improvements* § 3 (1968).

3. The Department alleges that the Tax Court "decided that the drop cables were a fixture, but belonged to Metrovision.... In essence, the Tax Court has decided that Metrovision now owns a real property interest in all of its subscribers' homes." This is a misstatement of the Tax Court's ruling. Rather the Tax Court decided that the drop cables were fixtures, and thus part of the subscribers' realty. It further ruled, correctly, that the issue of ownership was irrelevant to its determination.

4. In making this argument, the Department relies on *Supervisor of Assessments of Baltimore County v. Fitzgerald*, 49 Md.App. 411, 431 A.2d 1381 (1981). The case at hand is clearly distinguishable from *Fitzgerald*. In *Fitzgerald*, the Tax Court failed to conduct a hearing or even review the record of the hearing that had been held previously before the hearing examiner. Rather, the Tax Court simply stated that it "reviewed, considered and adopted the Examiner's Recommendations as the grounds for its decision." *Id.* at 415, 431 A.2d 1381. We reversed on the ground that the Tax Court not only failed to state its reasons for its decision, but also *completely failed to address the evidence. Id.* at 418, 431 A.2d 1381. Here, the Tax Court conducted a hearing at which both sides presented evidence. Moreover, it thoroughly reviewed all evidence and set forth the grounds for its decision in a ten-page memorandum opinion.

because it "determined that it did not need to consider the impact" of Metrovision depreciating the drop cables on its books and servicing the drops during the subscription period. Again, the short answer is that the Tax Court expressly considered and made specific findings of fact with regard to these issues. The Tax Court found that the financial treatment of the drop cables by Metrovision "does not defeat the *intent* of [Metrovision] to relinquish and abandon the drops upon installation." *See T–V Transmission, Inc. v. County Board of Equalization of Pawnee County*, 215 Neb. 363, 338 N.W.2d 752, 754 (1983) (where cable television company stated that it did not intend to remove the drop, had never removed a drop, and where it lacked the right to remove the drop, it had abandoned the drop and therefore had the "intent" under a fixtures analysis for the drop to be a permanent accession to the freehold). The Tax Court further found that maintenance and service of the drops by Metrovision is not motivated by "any intent to exercise powers attributable to ownership."

Nor is the Department's final contention as to the drop cable issue—that there was no substantial evidence to support the Tax Court's decision and that evidence as to depreciation and servicing required it to reach a contrary conclusion—well-founded. There was abundant evidence in the record that Metrovision has never removed, and never intends to remove, a drop cable from the premises of a subscriber. The subscriber may use the drop cable as he or she chooses, both during service and after termination. Once service is disconnected, the subscriber may leave the drop cable in place, thereby making it readily available for future reconnection, or tear it away. These facts provide substantial evidence for the Tax Court's finding that Metrovision had the intent to make the cable a "permanent accession" to the subscriber's home. Similarly, there was evidence that the servicing arrangement, and depreciation of the drop cables, do not require a contrary conclusion as to Metrovision's intention. With respect to Metrovision's maintenance of the cables, a vice president of Metrovision

testified that the company is required, under its franchise agreement with the county, to maintain the cable system after it is constructed, not because the company owns the cable, but because it is important to "deliver a good quality signal." He further testified that Metrovision maintains the system because the Federal Communications Commission requires it to do so. As for depreciation, a certified public accountant employed by Metrovision testified that the IRS requires depreciation of the drop cables and that absent the IRS requirement, it would have been advantageous from a tax savings perspective for Metrovision to expense the drop cables instead of depreciating them. *See Hoppe v. Televue Systems, Inc.* (State of Washington Board of Tax Appeals 1976) (cable company's depreciation of drops for income tax purposes did not disqualify company from claiming a "nontaxable status," since "[t]he income tax deduction is based on a business investment concept, a matter wholly distinguishable from the concept of ownership"); *Tele–Vue Systems, Inc. v. County of Contra Costa,* 25 Cal.App.3d 340, 101 Cal.Rptr. 789, 792 (1972) ("the classification of property for purposes of ad valorem taxation, and the income tax laws and regulations relating to depreciation deductions, are based on entirely different concepts").[5]

---

5. As these cases indicate, the conclusions reached by the Tax Court here are in accord with a number of out-of-state decisions on the issue. *See also T–V Transmission, Inc. v. County Board of Equalization of Pawnee County,* 215 Neb. 363, 338 N.W.2d 752 (1983) (applying fixture test identical to that in Maryland and finding that, since drop cables were not removed after termination of service, cable company had no agreement with subscriber preventing subscribers use of drops and company did not claim ownership of drops or reserve an easement across property of subscribers, it was the intention of the cable company to make the drops permanent accessions to realty, and so the drops were not subject to state personal property tax); *In re Telerama, Inc.,* determination no. 13269 (Ohio Tax Commissioner 1972). This view is not, however, universal. In the most recent decision in the area and the case upon which the Department places principal reliance, *Continental Cablevision, Inc. v. City of Roseville,* 430 Mich. 727, 425 N.W.2d 53 (1988), the Supreme Court of Michigan held that the drop cables should be regarded as personal property of

In sum, the Tax Court did not commit legal error in applying the fixture test, and its findings are supported by substantial evidence. Having said that, we do note, however, that it is not at all clear to us, particularly in view of the difficulty in determining whether something is a fixture,[6] that the common law fixture test is truly relevant or appropriate in deciding whether drop cables should be taxed as the personal property of a cable company. This is so because exactly the same facts that led the Tax Court to find that the third prong of the fixture test had been met, i.e., that Metrovision intended to make a permanent annexation to the freehold, could as easily lead to the opposite conclusion. For example, although it is true that Metrovision has never removed, and never intends to remove, a drop cable from a subscriber's home, this is concededly because the cost of doing so is prohibitive, not because of any intent by the cable company to bestow a gift on its subscribers; thus, the probative value of these facts as evidence of Metrovision's intention to affix the cable is small. Similarly, although the contract between Metrovision and its subscribers contains no reservation to the company of rights over the drop cables, it is equally true that the contract contains no agreement to transfer ownership of the drop cables to the subscribers; again the evi-

---

the cable company and so, subject to the state personal property tax. See also Chillicothe Cablevision v. Limbach, unreported slip op. case no. 1341, 1987 WL 12460 (Ohio App.1987). Roseville is distinguishable from the case at hand in two important respects. First, the Michigan Tax Tribunal had found that the drop cables were personal property and the appellate court was applying a "narrow" standard of review, similar to Maryland's, to those findings instead of findings, like those here, that the cables are not personal property. Roseville, supra, 425 N.W.2d at 56–57. Secondly, in Roseville, the Tax Tribunal and the appellate court heavily relied upon the fact that, in the service contract between the subscriber and cable company, the company had expressly reserved rights of ownership and control over the drop cables. Id. at 58–59. There are no similar provisions in the contract between Metrovision and its subscribers.

6. S. Stiller, The Maryland Law of Fixtures, 25 Md.L.Rev. 21, 32 (1965) ("The venerable problem of defining 'virtue' is no more difficult than the problem of defining a 'fixture' ").

dence of intention, one way or the other, is minimal. Likewise, Metrovision treats the drop cable, for accounting purposes, as its asset, and depreciates it, but this indicates little about the company's intention in light of the fact that the Internal Revenue Service requires this treatment.[7]

The Department, the party whose position we reject, however, not only does not here, and did not below, urge another test that might yield a more favorable result to it, but has, throughout the proceedings in this case, vehemently espoused the fixture test.[8] In fact, pursuant to its authority under Tax Property Article § 2–201(2) "to administer the assessment and tax laws of the State," the Department has promulgated the following regulation which incorporates the common law fixture test and governs this case:

> [a]ll structures shall be considered real estate unless they are considered to be personal property. Personal property is property not generally affixed to or a part of the real estate. In deciding whether an item is personal

---

7. At one time, the Court of Appeals was of the view that the common law definition of fixture had "never been imported into the law of taxation." *Commissioners Anne Arundel County v. Baltimore Sugar Refining Co.,* 99 Md. 481, 484, 58 A. 211 (1904). *See* S. Stiller, *The Maryland Law of Fixtures,* 25 Md.L.Rev. 21, 39 (1965) ("Tax law has refused to have any truck with the law of fixtures"). More recently, however, the Court has indicated that this holding is limited to cases involving the "machinery in a manufacturing plant" and that, when dealing with "fixtures" in dwellings "designed for residential use," the fixture analysis is appropriate in determining whether something is real or personal property. *State Dept. of Assessments and Taxation v. Town and Country–Woodmoor, Inc.,* 256 Md. 584, 588–89, 261 A.2d 168 (1970); *accord, Comptroller of the Treasury v. Steuart Inv. Co.,* 312 Md. 1, 8, 537 A.2d 607 (1988).

8. Amicus Curiae, Cable Television Association of Maryland, Delaware, and the District of Columbia, suggests that the appropriate test is whether the drops constitute "improvements to land." That test, which is disavowed by both the Department and Metrovision, appears to us to be no more suited to the idiosyncracies of drop cables than the common law fixture test. An alternative to using either the fixture or the "improvement to land" test would be legislative regulation of private cable companies similar to that of public utilities. *See* Md.Tax–Prop.Code Ann. § 8–201(1). It would seem to us that such legislation might well make sense.

property or real estate one should consider the manner in which it is affixed, the intention of the party who made the affixation, and the purpose for which the premises are made.

COMAR 18.02.01.01C. Nor is there any suggestion, in any authority, of another legal standard that would be more helpful in determining the tax status of drop cables. Indeed, *every* out-of-state authority–no matter how it has resolved the ultimate question at issue here–has applied the fixture analysis. Thus, there is no basis for concluding that the fixture test was not the proper legal test here. Since this is so, and since the Tax Court did not err in applying the fixture test to the evidence, we affirm the Tax Court's finding that the drop cables are fixtures and so are not to be taxed as Metrovision's personal property.

(iv)

■ As to the "make ready" costs, the Department argues that the Tax Court, by excluding these costs from its valuation of the property, "altered the cost approach to an unrecognized method not designed to produce full cash value."

■ Property, under whatever method of tax valuation, must be assessed at its "full cash value." Md.Tax–Prop. Code Ann. § 1–101 (defining value as "full cash value" of property). Usually "full cash value" equals "market value–what a willing purchaser would pay to a willing seller in the open market." *State Dept. of Assessments and Taxation v. Greyhound Computer Corp.,* 271 Md. 575, 586, 320 A.2d 40 (1974) (and cases cited therein). There are circumstances, however, when this "market" method of valuation is inadequate. Accordingly, when an article is "of so special a nature that no market for it exists then its intrinsic value must be ascertained by a consideration of its cost, nature, utility and other characteristics." *Id.* at 586, 320 A.2d 40. The parties agree that this is an occasion when the market method is inadequate, *i.e.,* there are no comparable sales of the items involved here, and that the "cost"

method of evaluation is appropriate. There is, apparently, no Maryland case law or even administrative regulation setting forth what items are to be included in the assessment to reach "full cash value" under the cost approach.[9] Thus, discernment of the applicable legal standard would seem to be extremely difficult.

There is, however, no disagreement as to the appropriate legal standard for determining items to be included in order to obtain "full cash value" under the cost approach. It is undisputed that the assessing authority, the Department, properly includes in its assessment when using the cost approach: "all costs necessary to get an asset operational." The State Supervisor for Personal Property, Mr. Michael Griffin, after being qualified by the Tax Court as an expert on the cost approach and generally, on valuation of personal property, testified:

> The definition that we use in the cost approach is we include in the basis of cost all costs necessary to get an asset operational.
>
> \* \* \* \* \* \*
>
> Cost would include the invoice price of the asset, the freight, the sales tax, installation, site preparation. Those are generally what is included.
>
> \* \* \* \* \* \*
>
> The definition that is spelled out by generally accepted accounting principals [sic] is, for the most part, identical to what we use. In fact we refer to publications from financial accounting standard boards and from the AIPC-PA association, in order to get clarification sometimes on cost approach.
>
> But for the most part, every definition, whether you are speaking of a general accounting book principals [sic] one, or whether you get into more advanced accounting

---

9. Metrovision appealed only the inclusion of make ready costs in the assessment. It never disputed the value or amount of depreciation assessed by the Department.

principals, define cost as all costs necessary to get an asset operational.

* * * * * *

The make ready costs would qualify, in our definition, as site preparation. There's no way that they can eventually get their cables up without this site preparation having taken place. It is a cost to get their assets [the cables] operational.

When asked by counsel for the Department whether the use of the cost approach is indicated anywhere in the regulations, Mr. Griffin responded that, "The regulations refer to the acquisition cost, which again our definition of acquisition cost internally that we use is the generally accepted accounting principal [sic], all costs necessary to get an asset operational."

Metrovision does not suggest that this standard—"all costs necessary to get an asset operational"—is erroneous. Indeed, at oral argument, Metrovision expressly conceded that this was the correct standard. What Metrovision claims is that the Tax Court correctly applied this standard and properly determined that the "make ready costs incurred by Metrovision did not create any additional value in the corporate property owned by Metrovision." The Tax Court's actual findings on the issue are as follows:

We disagree with the [Department's] approach. § 8–106 of the Tax-property Article of the Annotated Code of Maryland provides that "the value of personal property shall be its value on the date of finality." "Value" is defined in § 1–101 of the same Article as "the full cash value of property." "Full cash value" has been determined to mean "market value—what a willing purchaser would pay to a willing seller in the open market." *State Department of Assessments and Taxation v. Greyhound Computer Corp.,* 271 Md. 575, 586, 320 A.2d 40 (1974). Nothing in either statute or caselaw indicates that a valuation for tangible personal property tax purposes of a particular item of personal property can be based on all of the costs borne by a business to provide

its service to its customers. The assessment is on personal property, a tangible, not on all items necessary for a company to sell its product. Such an assessment as [the Department] suggests would tax both tangible and intangible costs (i.e., going concern, value, goodwill value) of property rights not before us in this case.

Make ready costs are too far removed from the cost of the asset, the cable, to be included in that asset's value.

The Tax Court went on to explain that "make ready" costs, unlike labor costs, sales tax, and certain other intangible expenses which all parties apparently agree are costs to be included in the cost valuation approach, "are not costs paid to acquire the wires, or to prepare the wires for installation or to actually install the wires. Make readys are payments for work performed on property owned by a distinct entity [the utilities] prior to any installation."

■■■■ Thus, it is clear that the Tax Court seemed to understand that the "full cash value" standard requires that, although intangible personal property cannot be taxed, certain intangible expenses of tangible personal property may be included in the assessment of that property when using the cost method for valuation of personal property. The Tax Court, however, failed to apply these principles to determine whether make ready costs are site preparation costs appropriately included in an assessment of the full cash value of personal property. That is, it failed to apply the legal standard that the parties agree is applicable here. That standard, as set forth by Mr. Griffin, and undisputed by Metrovision, is "all costs necessary to get the asset [the wires] operational." [10] To the extent that the Tax Court

---

10. The Tax Court further found that the Department, by including make ready costs in its assessment, incorrectly attempted "to value the system as a whole and not the individual tangible components." The Department appeals this finding on the ground that personal property must be valued according to its highest and best use. This argument is disposed of by our holding that cost valuation includes, not solely the cost of the tangible personal property, but all costs necessary to make an asset operational.

found that the cost approach could not be extended to include "all of the costs born by a business to provide its service to its customers," it was correct. Indeed, the Department concedes that the cost approach should not be so extended. The Tax Court, however, must determine if the make ready costs are among the costs "necessary to get the asset operational." Because the Tax Court failed to apply this, the correct legal standard, we remand this case, *see National Arena v. Comptroller*, 308 Md. 370, 519 A.2d 1277 (1987), for a determination by the Tax Court of whether make ready costs are site preparation costs that are necessary to get the asset operational. In making this determination the Tax Court may wish to consider whether make ready costs are attributable to the acquisition of a license to use the utility right-of-ways and, for this reason, not costs necessary to get the asset operational. The latter issue was not raised in precisely this way originally in the Tax Court. After the Tax Court's original decision, however, the Internal Revenue Service issued a ruling which the Tax Court may find relevant to this issue.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.

CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH DIRECTIONS TO REMAND TO THE TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEE.